**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE SANOFI-AVENTIS SECURITIES
LITIGATION

MEMORANDUM DECISION
AND ORDER

07 Civ. 10279 (GBD) (FM)

GEORGE B. DANIELS, United States District Judge:

Before the Court is the Motion for Class Certification of Lead Plaintiffs Hawaii Annuity

Trust for Operating Engineers' ("Hawaii") and New England Carpenters Guaranteed Annuity

Fund ("NE Carpenters"). In this suit, Lead Plaintiffs allege that Defendants, Sanofi and two of

its former top executives, violated the Securities Exchange Act of 1934 on two occasions, by

giving statements that were materially misleading as to the development of the drug rimonabant.

Lead Plaintiffs seek to certify the following class:

> All purchasers of Sanofi American Depository Receipts ("ADRs") and United
> States-based purchasers of Sanofi common stock in domestic transactions, during
> the period February 20, 2006 through June 13, 2007, who were damaged as a
> result of defendants' violations of federal securities laws.

Lead Plaintiffs also seek an order appointing them as class representatives, and an order

appointing their law firm, Robbins Geller Rudman & Dowd LLP, as class counsel.

This Court grants Lead Plaintiffs' motion to the extent that it seeks to certify a class of all

purchasers of Sanofi ADRs, led by Hawaii as the class representative, from February 24, 2006,

through June 13, 2007. NE Carpenters cannot serve as class representative, nor does it have a

cognizable cause of action against Defendants, as its claims do not fall within the ambit of the

Exchange Act after <u>Morrison v. National Australia Bank</u>, __ U.S. __, 130 S. Ct. 2869 (2010).

1

**Background**

The Court assumes the parties' familiarity with the facts, and only recounts those

necessary to reaching a decision on class certification.  Sanofi is a French corporation whose

common shares are predominantly traded on a European stock exchange, Euronext.  Second

Amended Compl. ("SAC"), ¶ 20; 2006 Sanofi 20-F, Vogele Decl., ECF. No. 191, Ex. 6, at 136.

Lead Plaintiffs allege that on February 17, 2006, the Food and Drug Administration sent Sanofi a

letter asking them to reassess certain data concerning the link between rimonabant and

"suicidality."[1]  SAC ¶ 7.  They allege that after receiving this letter and beginning an

independent assessment of the data by Dr. Kelly Posner of Columbia University, Defendants

made two statements that mislead investors as to the status of FDA approval of the drug.  Id.

The alleged misstatements were made on two earnings calls.  Lead Plaintiffs allege that

on Febraury 24, 2006, defendant Gerard Le Fur, then Sanofi's Senior Executive Vice President

of Scientific and Medical Affairs, violated the Exchange Act when he gave an overly optimistic

and misleading report that the FDA had not requested any additional clinical trials with respect

to the drug's use for treating obesity.[2]  SAC ¶¶ 51-52.  Plaintiffs allege that this statement "kept

investors in the dark regarding the FDA's concerns about suicidality."  Pl. Mem. of Law, ECF.

No. 170, at 4.

---

[1] According to Lead Plaintiffs, suicidality is a "term of art used to describe both suicidal thoughts and behaviors."
Pl. Mem. of Law, ECF. No. 170, at 4.

[2] The full misstatement reads "So as you know, in the non-approvable letter that we received on rimonabant, the
FDA asked us to perform an additional clinical study in smoking cessation.  But in the approvable letter, no
additional trial in obesity has been requested by the agency and we will meet the FDA in the coming weeks to
address all remaining issues.  And I'm pretty sure that you will understand that we'll not comment any more on
rimonabant because we first need to meet the FDA and to work with them on the rimonabant dossier."  Q4 2005
Sanofi-Aventis Earnings Conference Call, Feb. 24 2006, Vogele Decl., ECF. No. 191, Ex. 4, at 15-16.

The second alleged misstatement came several months later.  On October 26, 2006, defendant Hanspeter Spek, then Executive Vice President of Pharmaceutical Operations, declined to mention suicidality or the Posner study in response to an inquiry regarding whether Sanofi had provided new clinical data to the FDA.  Sanofi, in fact, had provided the FDA with an analysis of Posner's study.  Instead, Spek answered that "the approvable letter did not ask for new additional clinical trials, [and] we have not submitted new data in this respect."  Q3 2006 Sanofi- Aventis Earnings Conference Call, Oct. 31, 2006, Vogele Decl., ECF. No. 191, Ex. 5, at 21.  Lead Plaintiffs claim that this statement covered up the FDA's concern over the link between the drug and suicidality.

Lead Plaintiffs allege that the corrective disclosure, informing the market of the FDA's concerns, came on June 13, 2007, when the FDA held a public hearing to review the data it had received regarding rimonabant.  SAC ¶¶ 79-90.  They contend that it was at this hearing that the public was first informed that there was a statistically significant link between rimonabant and suicidality, and that this revelation rendered the two statements at issue materially misleading. Id.  At that hearing, the FDA committee voted, unanimously, not to recommend approval of the drug, and Sanofi sent out a press release to that effect later that day.[3]  Id.  Lead Plaintiffs thereafter brought this suit for violations of the Exchange Act in November, 2007.

Lead Plaintiffs propose two institutional pension funds as class representatives, Hawaii and NE Carpenters.[4]  Hawaii is a Taft-Hartley, multi-employer trust fund with approximately

---

[3] Although not relevant here, Defendants dispute the importance of this hearing, arguing that the FDA had released all of the information that was discussed at the hearing two days earlier in a briefing document.  FDA Briefing Document, Vogele Decl., ECF. No. 191, Ex. 16.

[4] In addition to these two entities, this Court initially appointed the City of Edinburgh Council of the Lothian Pension Fund ("City of Edinburgh") as a lead plaintiff.  Order of Feb. 29, 2008, ECF. No. 16.  It has not moved for class certification, and it has explicitly consented to the motion that Hawaii and NE Carpenters filed, their

1,200 participants and assets valued at $116 million. Ilacqua Decl., ECF. No. 174, ¶ 2. During the class period, it purchased 1,600 ADRs on the New York Stock Exchange, a domestic exchange, on March 15, 2007 and March 16, 2007 at an average price of $42.13 per share. Id. ¶ 4. It sold these shares after the alleged corrective disclosure at an average price of $39.93 on August 23, 2007 and August 24, 2007, for a total loss of about $3,500. Hawaii Brokerage Statement, Trig Decl., ECF. No. 233, Ex. 52.

NE Carpenters is a joint employee-employer Taft-Hartley pension fund with approximately 3,200 participants and assets of $1.6 billion. Dow Decl., ECF. No. 173, ¶ 2. During the class period, it purchased 41,400 shares of Sanofi common stock in several off-exchange transactions at an average price of $68.63 per share. Id. ¶ 4. It does not argue that its purchases involved any meeting of the minds in the U.S., nor does it offer any facts to suggest that they did. Instead, NE Carpenters argues that 6,700 of these shares were "domestic transactions" solely because they were cleared, in part, through a domestic clearing firm. Pl. Reply Mem. of Law., ECF. No. 206, at 19. It sold some of these shares after the class period ended at a loss. Dow Decl., ECF. No. 173, ¶ 4.

Lead Plaintiffs bring this motion to certify a class, contending that all of the prerequisites of Rule 23(a) and (b)(3) are met. Defendants oppose certification. They argue that Lead Plaintiffs cannot satisfy the typicality and adequacy requirements of Rule 23(a)(3) and (a)(4), respectively, and that Lead Plaintiffs fail to meet the predominance requirement of Rule 23(b)(3). They also argue that NE Carpenters cannot serve as a class representative because it does not have any cognizable claim at all after Morrison.

---

application for appointment as class representatives, and the application for appointment of Robbins Geller Rudman & Dowd as class counsel. Pl. Mem. of Law, ECF. No. 170, at 1, n.2. Because City of Edinburgh has not moved to certify a class with it as representative, this Court does not address any applicable Rule 23 analysis.

**Legal Standard**

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010). This Court must undertake "a rigorous analysis" and resolve any relevant factual disputes. In re Am. Int'l. Grp. Secs. Litig., 689 F.3d 229, 238 (2d Cir. 2012). The Rule 23 inquiry may overlap with that of the merits, although courts are not permitted to engage in "free-ranging merits inquiries at the certification stage." Dukes v. Wal-Mart Stores, 131 S. Ct. 2541, 2551 (2011); Amgen Inc. v. Conn. Ret. Plans & Trust Funds, __ U.S. __, 133 S. Ct. 1184, No. 11-1085, 2013 U.S. LEXIS 1862 at * 19 (U.S. Feb. 27, 2013).

Rule 23(a) has four threshold requirements: (1) numerosity ("the class is so numerous that joinder of all members is impracticable"), (2) commonality ("there are questions of law or fact common to the class"), (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"), and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class"). Fed. R. Civ. P. 23(a). Once the Plaintiff has demonstrated that its proposed class meets these four requirements, this Court must determine whether the action can be maintained under one of the three subsections of Rule 23(b). Fed. R. Civ. P. 23(b). Here, Plaintiffs argue that class certification is appropriate under Rule 23(b)(3) because "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Id.; Pl. Mem. of Law at 17.

5

## The Requirements of Rule 23 Are Met

Numerosity, Commonality

Lead Plaintiffs have met their burden to demonstrate numerosity and commonality under Rule 23(a)(1) and (a)(2), something Defendants do not seriously dispute.  Numerosity is presumed when a class consists of forty or more plaintiffs.  Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).  "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period."  In re Bank of Am. Corp. Secs. Litig., 281 F.R.D. 134, 138 (S.D.N.Y. 2012).  The exact number of class members need not be known, so long as the contours of the class are ascertainable by reference to objective criteria.[5]  Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993).

Lead Plaintiffs have satisfied the numerosity requirement by demonstrating that there were 241.4 million ADRs available for trading during the class period, and that 474.8 million ADRs traded during this period.  Smith Decl., ECF. No. 173, Exs. B, C.  Whether a prospective class member purchased Sanofi ADRs during the class period and sold them after its end can be objectively determined by looking at brokerage or trading statements.  This Court finds that Lead Plaintiffs have satisfied the numerosity requirement.

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury."  Wal-Mart, 131 S. Ct. at 2551.  In general, "where putative class members have

---

[5] Although it does not appear in the statute, Courts have read this implicit "ascertainability" requirement into Rule 23(a).  See, e.g., In re Bank of Am. Corp. Secs., 281 F.R.D. at 140, In re Fosamax Prods. Liab. Litig., 248 F.R.D. 389, 395 (S.D.N.Y. 2008); In re Wachovia Equity Secs. Litig., No. 08 Civ. 6171, 2012 U.S. Dist. LEXIS 97910 at *6 (S.D.N.Y. June 12, 2012).  This is easily met in the context of securities litigation where the list of shareholders is readily obtainable.

been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied." Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. 176, 180 (S.D.N.Y. 2005). Here, Lead Plaintiffs claim that the same two misleading statements caused injury to all holders of ADRs by artificially inflating their price. Such a common course of conduct is routinely used to satisfy the commonality requirement, which Lead Plaintiffs have done. See, e.g., Anwar v. Fairfield Greenwich, No. 09 Civ. 118, 2013 U.S. Dist. LEXIS 26088, at *28 (S.D.N.Y. Feb. 22, 2013); City of Livonia Employees' Ret. Sys. v. Wyeth, 284 F.R.D. 173, 175 (S.D.N.Y. 2012); In re IndyMac Mortgage-Backed Sec. Litig., 286 F.R.D. 226, 233 (S.D.N.Y. 2012).


Typicality and Adequacy

To demonstrate typicality, Lead Plaintiffs "must show that each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009). Lead Plaintiffs' claims need "arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." In re Vivendi Universal, S.A., 242 F.R.D. 76, 85 (S.D.N.Y. 2007) (citing Marisol A. v. Giuliani, 929 F. Supp. 662, 691 (S.D.N.Y. 1996), aff'd 126 F.3d 372 (2d Cir. 1997)). Defendants can show that a plaintiff's claim is not typical if that plaintiff is subject to unique defenses that threaten to become the focus of the litigation.[6] Livonia, 284 F.R.D. at 178; Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d. Cir. 2000).

---

[6] The issue of unique defenses does not always fit neatly into any one requirement of Rule 23. Courts have considered such argument under several different prongs. See e.g., In re Flag Telecom Holdings, Ltd., 245 F.R.D. at 163 n. 18 (defendants unique defense argument relevant to both typicality and adequacy requirements); Rocco v. Nam Tai Elec., Inc., 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (same); Koppel v. 4987 Corp., 191 F.R.D. 360, 365 n.8 (S.D.N.Y. 2000) (analyzing unique defenses under the commonality, typicality and adequacy requirements).

The adequacy inquiry often overlaps with that of typicality.  In re Flag Telecom, 574 F.3d at 3.  It is two pronged, considering "whether 1) plaintiff's interests are antagonistic to the interests of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct litigation."  Baffa, 222 F.3d at 60.

Defendants contend that Lead Plaintiffs are neither typical nor adequate for two main reasons.  First, Defendants argue that Hawaii and NE Carpenters had knowledge of what was purportedly omitted from the two statements at issue.  Def. Oppo. at 39, 45.  To support this claim, Defendants cite the deposition testimony of Lead Plaintiffs' asset managers (those who made the decision to transact in Sanofi shares) who claim to have been closely following financial markets and financial press at the time of the misstatements.  Id. at 40, 45.  Because they were closely following news of the markets, Defendants claim that they knew the truth about rimonabant's uncertain status at the time of the misstatements.  Id.  Defendants argue that this makes them subject to unique defenses and thereby defeats typicality.  Id.

Generalized knowledge of the financial press does not make a plaintiff's claim atypical.  Here, it does not threaten to become the focus of the litigation.  Defendants never claim that Lead Plaintiffs' asset managers had unique knowledge—that is, information known to them that was not known to the rest of the market.  Such unique knowledge might make them subject to defenses that pertain only to them and not to other participants.  C.f. Kamerman v. Ockap Corp., 112 F.R.D. 195, 197-98 (S.D.N.Y. 1986) (denying certification where the sole proffered class representative did not rely on the market but learned of misleading statements on his own).  But Defendants' argument that Lead Plaintiffs had the same knowledge that the rest of the market had makes them, in fact, typical.

8

Second, Defendants argue that Hawaii will be subject to unique defenses because it suffered no economic loss. Def. Oppo. at 34. They contend that Hawaii had several opportunities to sell their ADRs at a gain after the end of the class period, but choose not to. Id. at 35. Because Hawaii could have sold their ADRs at a gain, any loss Hawaii suffered could not have been caused by any alleged misstatement. Id. Hawaii disagrees, and argues that the damages they suffered consist of Elkind "out of pocket" losses: the difference between the price it paid and the "value" of the ADRs when purchased. Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 168 (2d Cir. 1980).

Recently, the Second Circuit explicitly rejected Defendants' contention. In Rosado v. China North East Petroleum Holdings, Ltd., the Circuit vacated the judgment of the district judge, who had dismissed a putative securities action because the post-disclosure stock price had risen above the plaintiff's purchase price. 692 F.3d 34, 37 (2d Cir. 2012). The Circuit held that the loss for which the securities laws seek to compensate a plaintiff is the out-of-pocket loss as contemplated in Elkind. Id. at 40. This is the case regardless of whether the share price rebounds. Id. at 41. "In the absence of fraud, the plaintiff would have purchased the security at an uninflated price and would have also benefitted from the unrelated gain in stock price." Id. "[I]t would be improper to offset gains that the plaintiff recovers after the fraud becomes known against losses caused by the revelation of the fraud if the stock recovers value for completely unrelated reasons." Id.

The factors leading to the ADRs rebound in value after the corrective disclosure is not an issue that is unique to the ADRs that Hawaii bought---it is an issue pertinent to all purchasers of ADRs, and subject to generalized proof. Plaintiffs will have to prove that they purchased their shares at an inflated price, and that post-disclosure, the price rebounded for reasons unrelated to

the fraud.  This is a merits issue that does not, in this case, overlap with any of the Rule 23 requirements, and is thus inappropriate for consideration at this stage.[7]

Although Defendants couch these two arguments as a challenge to adequacy as well as typicality, these concerns do not implicate any of the traditional requirements for adequacy. Defendants offer no reasons bearing on how Lead Plaintiffs' interests are antagonistic to the interests of other members of the class.  Nor do they offer any reasons for why Lead Plaintiffs' attorneys are unqualified, inexperienced, or unable to conduct the litigation.  Hawaii is adequate to serve as Lead Plaintiff and class representative.  Its interests are not antagonistic to the rest of the class, and it has retained attorneys who have ample experience representing plaintiffs in securities fraud class actions.  Firm Resume, Trig Decl., ECF. No. 233, Ex. O.

In sum, Lead Plaintiffs have established by a preponderance of the evidence that all of Rule 23(a)'s requirements are met.

Rule 23(b): Predominance and Superiority

To certify a class, Lead Plaintiffs need also meet the requirements of one of the subsections of Rule 23(b).  Lead Plaintiffs seek to certify their class pursuant to Rule 23(b)(3), which requires them to demonstrate that "questions of law or fact common to class members

---

[7] Defendants argue in passing that Hawaii's representative demonstrated that he was too uninvolved in the litigation to represent the class, and that Hawaii's economic loss is so small that its claim is either inadequate or atypical. Def. Oppo. at 41, n.36.  "Courts rarely deny class certification on the basis of the inadequacy of class representatives, doing so "only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." In re Pfizer Secs. Litig., 282 F.R.D. 38, 51 (S.D.N.Y. 2012). Here, Hawaii's knowledge of the case is not so small as to render it "unable or unwilling to protect the interests of the class." Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1077-78 (2d Cir. 1995). Further, this Court knows of no requirement that the losses suffered by the representative exceed any threshold, and Defendants have not cited any caselaw for that proposition.

predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b). "Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." Erica P. John Fund, Inc. v. Halliburton Co., __ U.S. __, 131 S. Ct. 2179, 2184 (2011).

In a securities fraud case such as this one, one of the elements that a plaintiff must prove is reliance on the defendant's misrepresentation or omission. Matrixx Initiatives, Inc. v. Siracusano, __ U.S. __, 131 S. Ct. 1309, 1312 (2011). This element is essential because it "ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." Halliburton, 131 S. Ct. at 2185 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 243 (1988) (internal quotations marks omitted). Because requiring proof of direct reliance by each plaintiff would impose an "unnecessarily unrealistic evidentiary burden," the Supreme Court allows class plaintiffs to invoke a rebuttable presumption of "fraud-on-the-market." Basic, 485 U.S. at 245. This theory rests on the notion that "certain well developed markets are efficient processors of public information" and that the market price of shares reflects all publically available information. Amgen, 2013 U.S. LEXIS 1862 at *12.

To avail themselves of the fraud-on-the-market presumption, plaintiffs must demonstrate that (1) the alleged material misstatements were publically known, (2) that the security traded on an efficient market, and (3) that the plaintiff purchased his shares between the time the misleading statement was made and the time the truth was revealed. Halliburton, 131 S. Ct. at 2185. Plaintiffs have met this showing and Defendants do not seriously contest any of these elements. The alleged misstatements were made on earnings calls and widely reported to the market. See Def. Oppo., at 21-27 (recounting all of the press that Sanofi's statements received).

11

Sanofi ADRs traded on the New York Stock Exchange, an efficient market. See Fait v. Regions Fin. Corp., 712 F. Supp. 2d 117, 122 (S.D.N.Y. 2010). And there is no question that Hawaii purchased its shares after the first misstatement and did not sell them before the class period ended. Hawaii Brokerage Statement, Trig Decl., ECF. No. 233, Ex. 52.[8]

Defendants devoted great resources and much of their opposition brief to rebutting the fraud-on-the-market presumption by showing that their alleged misstatements were not material. Def. Oppo. at 14-21, 27-32. Recently, the Supreme Court squarely held that plaintiffs need not prove materiality at the class certification stage. Amgen, 2013 U.S. LEXIS 1862 at *25. "[P]roof of materiality is not required prior to class certification because such proof is not necessary to ensure satisfaction of Rule 23(b)(3)'s predominance requirement." Id. at *22, n.4. In the wake of this decision, Defendants formally withdrew this portion of their argument. Letter from Lewis J. Liman (March 5, 2013).[9]

---

[8] Lead Plaintiffs can also avail themselves of the presumption of reliance in Affiliated Ute Citizens v. United States. 406 U.S. 128 (1972). Under this presumption, "if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 159 (2008). When Sanofi representatives chose to speak, they took on a "duty to be both accurate and complete." Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002). "Sanofi had an unwaivable duty to be both accurate and complete when it spoke to investors." In re Sanofi-Aventis Secs. Litig., 774 F. Supp. 2d 549, 563 (S.D.N.Y. 2011).

    In a letter dated March 18, 2013, Defendants claim that the Second Circuit's recent decision in Levitt v. J.P. Morgan Secs., Inc. forecloses Lead Plaintiffs' ability to establish class-wide reliance based on Affiliated Ute, and therefore precludes class certification. No. 10-4596-cv, 2013 U.S. App. LEXIS 5329 (2d Cir. Mar. 15, 2013). Levitt has no bearing on this case. Levitt held that a clearing agent had no obligation to disclose a broker's fraudulent scheme to the broker's clients because the plaintiffs had not alleged "sufficiently direct involvement" by the clearing agent in the wrongdoing. Id. at 35. Defendants here––the speakers––were directly involved in the alleged wrongdoing. Defendants, the accused wrongdoers, acquired the duty to be both "accurate and complete" upon choosing to speak. Their own misleading statements would be the basis for their liability to the class.

[9] Lead Plaintiffs moved to exclude the declarations and testimony of two experts Marcia Kramer Mayer (ECF No. 208) and Carl J. Seiden (ECF No. 210). These experts opined on whether the two statements at issue were material for the purposes of class certification. See Mayer Decl., ECF. No. 188, at 1 ("Counsel for Sanofi . . . has asked me to opine on whether the two statements alleged by [Lead Plaintiffs] to be false and misleading meet the Second Circuit's standards for materiality and reliance in connection with Plaintiffs' motion for class certification."); Seiden Decl., ECF. No. 187, at 1 (remarking that counsel for Defendants retained him to opine on how the market would

Lead Plaintiffs have satisfied the predominance and superiority requirements of Rule 23(b).[10]  As is often the case in securities class actions, whether Defendants' statements were materially misleading to a reasonable investor is an issue "subject to generalized proof, and thus applicable to the class as a whole." Brown v. Kelly, 609 F.3d 467, 483 (2d Cir. 2010) (quoting Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 107-08 (2d Cir. 2007)).  Lead Plaintiffs have established by a preponderance of the evidence that they can rely on the fraud-on-the-market presumption.  All elements of Lead Plaintiffs' claims for misstatements and omissions are subject to generalized proof.  Where there are potentially hundreds of plaintiffs, adjudicating all of these questions in a single action is superior to doing so in individual actions. See, e.g. Livonia, 284 F.R.D. at 185.

## NE Carpenters Has No Claim after Morrison

Defendants contend that NE Carpenters do not have a cognizable claim after Morrison v. National Australia Bank.  In Morrison, the Supreme Court limited the extraterritorial application of the Exchange Act, holding that § 10(b) and Rule 10b-5, only apply to 1) "transactions in securities listed on domestic exchanges" or 2) "domestic transactions in other securities." Morrison v. National Australia Bank, 130 S. Ct. 2869, 2884 (2010).  The focus of the Exchange

---

have received the two alleged misstatements).  These motions are denied.  To the extent that this testimony is irrelevant, it is simply ignored.

[10] The only other challenge to predominance that Defendants raise is that of individualized knowledge.  This is the same challenge that Defendants raised to Lead Plaintiffs' typicality and it fails on the same grounds.  Defendants do not claim that Lead Plaintiffs had any unique knowledge that would lead individual issues to predominate over common issues.  Defendants only claim that Lead Plaintiffs had the same information as was widely distributed to the market, and that this information disclosed the truth about rimonabant. Def. Oppo. at 21-27.  This appears to be an argument that the statements at issue were not misleading, masked in Rule 23(b) language—an argument not appropriate for this stage of the litigation.

Act is on the location of the purchase or sale, "not upon the place where the deception originated," or the whereabouts of the investor. In re Satyam Computer Servs. Secs. Litig., No. 09 MD 2027, 2013 U.S. Dist. LEXIS 369 at *51, 55 (S.D.N.Y. Jan. 2, 2013) (quoting Morrison, 130 S. Ct. at 2884) (internal citations omitted).

NE Carpenters purchased only common shares, not ADRs.  Sanofi common shares are not traded or listed on any domestic exchange.  They are only traded on a European exchange, Euronext, and sometimes traded in off-exchange, over-the-counter transactions.  Sanofi Snapshot, Trigg Decl., ECF. No. 207, Ex. 48.  In order to state a cognizable claim post-Morrison, NE Carpenters must demonstrate that their purchase of common shares was a "domestic transaction in other securities."

With respect to "securities not registered on domestic exchanges, the exclusive focus [is] on domestic purchases and sales."  Morrison, 130 S. Ct. at 2885.  "[T]ransactions involving securities that are not traded on a domestic exchange are domestic if [either, (1)] irrevocable liability is incurred or [(2)] title passes within the United States."  Absolute Activist Master Value Fund, Ltd. v. Ficeto, 672 F.3d 143 (2d Cir. 2012) (as amended, 677 F.3d 60, 67). Defendants argue that NE Carpenters cannot meet either of these standards.  They argue that NE Carpenters cannot demonstrate that it incurred irrevocable liability in the U.S. because it has not identified any evidence that there was any domestic "meeting of the minds."  Def. Oppo. at 42. They argue that title could not have passed within the U.S. because Sanofi common shares are ineligible for settlement in the U.S, and therefore necessarily must settle in Europe, where they are immobilized.  Id. at 43-44.

NE Carpenters does not dispute that title passed outside of the U.S. and premises its claim solely on the irrevocable liability prong of the Absolute Activist test.  Letter from Trig R.

14

Smith (Oct. 1, 2012), at 5 ("plaintiffs' class definition is based on the irrevocable liability prong of <u>Absolute Activist</u> . . . .).  It argues it incurred irrevocable liability in the U.S. because Sanofi common shares are eligible for clearing through the National Securities Clearing Corporation ("NSCC," a subsidiary of the Depository Trust and Clearing Corp.), a domestic clearinghouse, and 6,700 of the shares it purchased actually cleared through the NSCC.  Pl Reply Mem. of Law at 16-18.  It contends that the point at which the parties invoke irrevocable liability is the time that their obligations are "matched" or "fixed" during the clearing process, not before.  <u>Id.</u> at 18.

The point of irrevocable liability is the point "when the parties to the transaction are committed to one another."  <u>Absolute Activist</u>, 677 F.3d at 68 (<u>quoting Radiation Dynamics, Inc. v. Goldmuntz</u>, 464 F.2d 876, 891 (2d Cir. 1972) (internal citations omitted)).  This is the point at which there is a "meeting of the minds of the parties," and the parties oblige themselves to perform.  <u>Absolute Activist</u>, 677 F.3d at 68.  This meeting of the minds occurs at the time when the parties enter into a binding contract.  <u>In re Vivendi Universal, S.A.</u>, 284 F.R.D. 144, 150 (S.D.N.Y. 2012).

NE Carpenters incurred irrevocable liability before any part of the trade touched the NSCC facilities in New York.  According to NE Carpenters' own expert, details of the parties' obligations are not entered into the NSCC system until "[a]fter agreeing to the terms of the trade."  Trimbath Decl., ECF. No. 172, at 3.  The clearing process is simply used to match orders and exchange information; it "begins when the trade is executed."  <u>Id.</u>  This means that there is a prior act by the parties that sets the trade in motion: the act of agreeing on the number of shares to exchange, and the price the buyer is to pay.  This is the point of commitment—when the architects of the trade agree on price and quantity—at which time they have entered into a

15

contract and incurred irrevocable liability.[11]  Matching and clearing the trade in the NSCC

system is nothing more than an automated, ministerial process for ensuring that the securities

eventually get to the buyer and the money to the seller.  See Bradford Nat'l Clearing Corp. v.

SEC, 590 F.2d 1085, 1091 n.2 (D.C. Cir. 1978) (noting that the first step in the trade is when the

two participants agree on terms, and that clearing is shorthand for the intermediate steps that the

parties need to complete in order to effectuate transfer of title, (i.e. settlement)).

NE Carpenters has not presented any other argument or evidence to suggest that it

otherwise incurred irrevocable liability in the U.S.  Its purchase of Sanofi common shares is not a

domestic transaction covered by the Exchange Act.  NE Carpenters therefore cannot serve as

lead plaintiff because it does not have a cognizable claim in this litigation.


### Appointment of Class Counsel

Lead Plaintiffs' also move this court for an order appointing their attorneys, Robbins

Geller Rudman and Dowd, LLC, class counsel pursuant to Rule 23(g).  This inquiry considers,

among other items, "(i) the work counsel has done in identifying or investigating potential claims

in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the

types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv)

the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

---

[11] It does not matter whether this commitment is made verbally over the phone before it is reduced to writing.  The New York Uniform Commercial Code states that the statute of frauds (with one exception, inapplicable here) is inapplicable to securities transactions. N.Y.U.C.C. §8-113(a) (a contract "for the sale or purchase of a security is enforceable whether or not there is a writing signed or record authenticated by a party against whom enforcement is sought . . ."). See also The Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588, 595 (2001) ("Oral contracts for the sale of securities are sufficiently common that the Uniform Commercial Code and statutes of frauds in every State now consider them enforceable.").  An enforceable contract arises at the moment the parties agree to the trade, whether on the phone or in writing.  This contract necessarily arises prior to the parties entering the details of the transaction into the clearing system.

Having demonstrated its ability to litigate these types of cases (see Firm Resume, Trig Decl., ECF. No. 233, Ex. O) and pledged to "vigorously protect the interests" of all potential plaintiffs, Robbins Geller Rudman & Dowd is appointed class counsel.  Pl. Mem. of Law., ECF. No. 170, at 17.  Defendants do not oppose its appointment.

## Conclusion

The Plaintiffs' Motion for Class Certification (ECF. No. 169) is GRANTED, in part.

This Court hereby certifies the following class:

> All purchasers of Sanofi American Depository Receipts ("ADRs") during the period February 24, 2006 through June 13, 2007, who were damaged as a result of defendants' violations of federal securities laws.[12]

Hawaii is appointed as the class representative.  Robbins Geller Rudman & Dowd LLP is appointed class counsel.


Dated: New York, New York
       March 20, 2013

SO ORDERED:

*George B Daniels*
GEORGE B. DANIELS
United States District Judge

---

[12] Lead Plaintiffs had requested that the class period start on February 20, 2006, despite the fact that the first alleged misstatement occurred on February 24, 2006.  Typically, the class period begins on the date of the first misstatement, as it is the injection of misinformation into the marketplace that distorts the price of the stock.  See, e.g., In re Bank of Am. Corp. Secs., 281 F.R.D. 134, 148 (S.D.N.Y. 2012) (beginning the class period in a securities class action on the date of the first alleged misstatement).